Our next case this morning is agenda number nine, case number 107276. People of the State of Illinois v. Cheryl Bartelt. You may proceed at your leisure, Counselor. Good morning, Your Honors. May it please the Court, Ms. Saunders. My name is Arden Lang. I'm from the Office of the State Appellate Defender here in Springfield, and I represent Cheryl Bartelt. Ms. Bartelt is asking this Court to review and reverse the decision of the appellate court in this case, and therefore, in essence, to reinstate the trial court order of suppression, which suppressed evidence taken based on events that occurred following a valid trial. This case creates a unique opportunity for this Court to consider a matter of first impression, and that first impression is because of the creativity of the Adams County Police. In this case, they developed a new procedure, which they ordered Ms. Bartelt to partake in during the traffic stop. As a matter of fact, at least the briefs reflect that they learned this not as something new, but they learned this at the K-9 Academy. That's what we hear, yes. But as far as I know, other than one case in Wyoming which didn't go to completion, this is the only recorded case of the use of this procedure in the United States. And this is the procedure. It's very short. The police officer called for the police dog, but did not use the police dog in the method set out by Illinois v. Cabalas. Instead, the police approached the car and were going to ask for identification. And here is what they told Ms. Bartelt. Close your windows. Close your doors. Open your vents. Turn your auxiliary power in your car onto high. And then later it's explained that sometimes they tell someone who looks at them blankly, well, turn it two clicks to the right. And this will cause the blowers in the car to send air out into the street. At that point, and only at that point, did they have the dogs, the dog, Max, walk around the car and the dog alerted. And based on that alert, the police physically entered the car, found a small amount of methamphetamine and arrested Ms. Bartelt. Do you believe the police officers could have simply asked her to open all of the windows and then walk the dog around the car? No, I do not, Your Honor. Can they ask her to open the car door and step out? They can ask her to step out. However, excuse me. Go ahead. Okay. Without opening the car door. Of course, federal case law teaches that the police have an absolute right to ask a defendant or a stop motorist to leave the car. That first, that isn't what happened in this case. And secondly, we don't know what would have happened if Ms. Bartelt did that. If she stepped out, we don't, she would have, I assume, had a right to close her door, lock the door, step away from the car. You know, I don't think this is an inevitable discovery case under any stretch of the imagination. Not on this record, anyhow. Counsel, we have not yet determined whether the window was open or closed. Is that accurate? That's correct. It doesn't say in the record. But these four admonishments or orders given by the police are the exact orders that they give every time. According, that's what we know from the record. So it doesn't say, the police officer did not testify, and so we can't really surmise that they would come up to a car and say, and always say, close your windows, or open, you know, or if your window is open, make sure. We don't know that. We know that these are the four orders that are given in Adams County and were given here. This was a truck, not an automobile. Yes, sorry. It was a vehicle. Was the rear of the truck enclosed? We don't know. It was a pickup. Okay. And if you've answered this, I apologize, but can an officer always lawfully order someone out of a vehicle incident to a lawful traffic stop? Yes. Justice Carmeier asked me that. I said yes and said that we don't, from this record, we can't assume any kind of inevitable discovery from that fact. Oh, as far as whether to pick up any type of smell? Oh, no. Exactly. Is that enough, though, that there's no reasonable expectation of privacy with respect to the vehicle's interior? Well, I think there is a reasonable expectation of privacy. He asked any smell. What do you mean? I think it's many layered. First of all, one has an expectation of privacy in the interior of a car. One does not have, if I may just go around this a little bit, one doesn't have an expectation of privacy outside the car. What I believe happened in this case, and I'd like to use a phrase that I think characterizes what the trial court found and what the dissent would have found on appeal, but there actually was a constructive entry by the police in this car. So I think that to suggest that only we must look at the air in the car is an improper way of looking at what happened in this case. And I know there are cases that say that the air outside of the car, you have no legitimate interest in privacy in the outside of the car, but here we are within the car, there are other, or the cab of the pickup in this case. No doubt. I guess what I'm getting at is that if indeed someone's subject to a lawful traffic stop, that the officer is allowed to tell the person to get out of the car, obviously you have to open the door of the car. I mean, can the court take judicial notice then that any smell in that car, since they can open the door, you know, judicial notice that any smell can come out, and the very prospect that it may come out, if we can take judicial notice of that, that there's not an expectation of privacy as to the odor in the car? No, I don't think that that's the case. That doesn't surprise me. No, of course not. But in this instance, it's really a police action. It's a probing. It's an exploration of the interior of the car, very specifically. If you look at USV bond and the luggage prep cases, in bond, even if you have a limited expectation of privacy, once there is a real intrusion, even from the outside, it's considered a real intrusion. It's considered an invasion of privacy. And so I think that, you know, it does make a difference that it is police action which caused this probing conduct. Ms. Lang, if the officer approached, I want to give you a hypothetical. If the officer had a flashlight, it was at night, you approach the vehicle and the batteries are dead in the flashlight, and he can't see in the car, would it offend the Fourth Amendment for him to say to the person, turn on the dome light in the car so I can see the inside? I think he could ask. I don't think that he can force somebody to do that. He could ask or ask the person out of the car, because we know that. In this instance, did he force this person to turn on the vent? Well, he did not seek consent, and it's clear, there's a stipulation by the prosecutor during the motion to suppress hearing that it was an order. It was not a request. So in my hypothetical, what if it's an order, turn on the dome light so I can see what's in the car? No, I don't think he can do that. Let's change the hypothetical. Is an officer allowed, if it's late at night and the car is dark, to flash his flashlight from outside of the car, inside the car, to see what's going on? Yes, he is. And if in doing that, the light shines on a gun on the seat, is that plain view? Yes, it is, but I don't think there's any plain view here. No, is there plain smell? Well, yes, that's the other side, but I don't think so, because the argument is that by the police intruding into a car where they could not have gone, because they did not have consent, they did not have reasonable suspicion, they did not have probable cause to enter this car. And yet they used this device, ordered the defendant to surrender her privacy, and they looked in through, or they caused the sense of the smell, the odor, if that's what it was, to go out of the car. And it's very much like the dog cases which are cited in all the briefs, and I think in the opinion and in the trial court order, there are a couple of cases, United States v. Hutchinson and United States v. Winningham, where in one case, the dog of its own volition jumps into a car or alerts to something that's open, and the police had a right to be there. And that is really the essence of plain view. The police are at a place where they have a right to be when they see something in plain view. They did not, in this case, have a right to be inside the car. If they facilitated the plain smell, that's not plain smell. That's a different concept altogether. Counsel, if we could try to make it a little simpler for me. Sure. The basis of your motion is an unreasonable search, is that correct? Yes. The same way as if it was counter band that was found in any other search that's made by police? Yes. Seizure, unreasonable seizure as well? There's some mention of it in your brief, I think. Yes, yes. I mean, once you search and you take it, it's seized. So while a dog sniff is not a search? Correct. The air is a search? Okay. If you look at dog sniff cases, you look at place, you look at Cabalas. In those cases, the air is outside, and Cabalas says, teaches that the use of a well-trained dog on the exterior of a car does not cause a breach of the right to privacy. Here, there is not an incidental emanation. Here, there is a police action which causes the air to come out. And we don't know what else there might have been. But if, there's no question, the officer could have ordered her out of the vehicle? Yes, but didn't. But didn't. But if he ordered her out of the vehicle, and because she opened the door, you smell it, is that a problem? Well, it wouldn't be. How is that different? Because in that instance, the police action in ordering someone out of the car may or may not have the air, you know, be the cause of air coming out. We don't know that. Here, it's not just that a door is opening and that there may be leaking through seams. Here, we have a blower which enhances the smell. There's no enhancement when someone opens a door. But that begs the question as to whether there is an expectation of privacy in that air. And if, under Justice Garmon's question, the officer would be allowed, as everybody agrees, to say get out of the car, and a dog would be allowed to be standing right there on the outside of the car under the case law. And if indeed, judicial notice or not, that air comes out, there would be no question that there wouldn't be an illegal search and seizure. And you agree with that. And it was perpetuated by the officer saying turn on the blowers if that air came out, that that's an illegal search. And it begs the question as to whether or not there's an expectation of privacy in the air in the car. And it would seem to me if you can order somebody out and that air can go out, there may not be an expectation of privacy, which would, you know, defeat any argument as to blowing air out of the car, wouldn't it? Well, I don't think so. We could look at an analogy to air in a house. Could an officer see someone who had sort of bad teeth and bad haircut walk into a house and think I'm suspicious there might be meth in there? Could the officer ask someone to open a window, to blow a fan? Could the officer have a dog walk around? These are different matters. And so we can't say that there's no legitimate expectation of privacy in air or in the interior. It's really, it's the interior of the car and its contents. When a dog is outside, there is no interior space that's being protected. It's open and obvious. Within the car it is not. If the police officer asks the person to get out of the car and wave their coat back and forth, is there an expectation of privacy of that and getting some sort of an odor from the coat or a purse, opening the purse to see if there's smelling? I think there is some violation of an expectation of privacy. Along a similar vein, could the officer ask a woman to dangle her purse out a window? There may be some air in there and it may not show the color of the woman's lipstick, but there's still an expectation of privacy because the officer had no right to be inside that vehicle. Okay. And if regard to this, if asking someone to comply with the procedures used here is not a search, then can a police officer require any citizen he comes upon who happens to be sitting in a car to follow the procedure? And I think not, clearly. I mean, this, I have examples I think in my brief and certainly in my reply brief of ways in which this newfound, I mean, this is not a search. This is a procedure, the setup procedure could be used in extreme and, you know, I mentioned in my brief that you could be at a drive-thru, one person could be at a drive-thru. Why can't the officer require someone in a drive-thru to roll up their windows and do this if there's nothing wrong with it? And, you know, it's sort of a line drawing procedure. Either the officer has a right to be in that car or, you know, the officer has to stay outside with the dog and Adams County chose not to do that in this case. Does it come down to that this was or was not a search? I think it was certainly and I think it was a search. But that's the question. Yes. Some might argue it was not a search. They could, but my argument is that it is an unreasonable search because in a sense the police made a constructive entry into the vehicle to investigate what was inside that vehicle. The constructive entry was by directing at the windows and would doors be closed in the air blower? Exactly. And then through the use of the dog, given that procedure, it's not that the dog sniff itself is wrong, but that the use of the facilitation process is what caused the search to be unreasonable. Your argument would be it was as if the dog went into the truck itself. Exactly. And we don't even know because there's been no testimony what the factual basis is for this procedure. We don't know if it works or not. We don't know whether the dog would have alerted with or without it. Whether it was alerting to blowers or to certain molecules coming through the vents. This really, you know, we don't know how effective this tool really is that Adams County is asking this court to endorse. I see my time is up. Good morning. I'm Assistant Attorney General Catherine Saunders on behalf of the people of the state of Illinois. At the outset I want to make clear that the police did not enter the vehicle.  So really the analogy of putting the police in the car, the dog in the car, is really inapt. And the cases like Winningham and Hutchinson and Stone that draw the distinction where the dog, they validate searches where the dog enters the car of its own volition or instinct, but invalidate searches where the officer facilitates the dog's entry to the car. It's really not an apt analogy here. If they had just permitted the dog to walk around without causing the blower on and the person to exit the car, then the dog would have automatically, if he smelts anything, alerted, right? So why did they just do that instead of having this false removal of the air from the inside of the car? Why do they do that? The record reveals that they were taught that procedure. Officer Kent was taught that procedure at the police academy and he said that the reason they do it is because it forces the air inside the car out through the seams and they train the canines to sniff at the seams. What he means exactly by seams I'm not sure I understand. If the dog just walked around it might not have been able to alert, so they had to force the air out so the dog would alert. We discovered that that works better than, and they can't go in the car, so they're going to pull the air out, is that right? We don't know. We don't know whether the dog would have alerted or not, so there's really no inevitable discovery argument in that respect because they didn't first take the dog around and then turn the blowers on, so really we don't know on this record. But if this is part of their training it's based on some purpose. The record does not reveal that. The only purpose the record reveals is that it forces it out the seams and that's where they train the dogs to sniff. Perhaps it just speeds up the procedure. We don't know. Isn't the record solid as to the extent to which the setup procedure enhances the dog's ability to find contraband? I'm sorry? Isn't the record solid as to the extent to which the setup procedure enhances the dog's ability to find contraband? We don't know the value of this procedure. We don't know the value of the procedure, no, we don't. We just know that it's a standard procedure, that's correct. So what happened here? Oh, I'm sorry. It seems to me the issue in this case is where we draw a line on setup procedures. We know that luggage that's been taken under the control of airport officials can be fluffed from the outside and pillowed down to force out air. And that's pretty much it in other setup cases, the luggage cases. There hasn't been a case such as this one where we have ambient air moved from the interior of the truck to the exterior of the truck. It's just an effort to do that. So isn't the task of this court to find out at what point the setup procedure is something other than benign? I mean, obviously we could all stay here and say it would be a great setup procedure for searching for drugs to have women  that would be a great setup procedure. Is it does it become admissible because it's a setup procedure? Of course not. What are we saying here? We're saying that this you this to this court this this setup procedure ought to be authorized because we let people we let people in. I guess I'm stumbling around a little bit. Why should this particular setup procedure be authorized by this court? Because it's not a search at all, Your Honor, for two independent reasons. First, for the for the reason Justice Thomas mentioned, that there's no legitimate expectation of privacy in the air in the vehicle. We know as drivers that air is constantly leaving our vehicle and being replaced. We know that our cars are subject to traffic stops or violate for equipment violations. And we know that when the officer make contact with us, we're going to have to roll down our window to make contact with the officer to speak with him and to hand him a license and registration. We know that the officer can order the driver and the passenger out of the vehicle during a traffic stop as a matter of course, under Mims and Wilson. So this air is inevitably going to be escaping from the vehicle in any event. And it's unreasonable. I mean, there's only a search under the Fourth Amendment where there's an expectation of privacy that the society is prepared to recognize as reasonable where that's infringed. And we're just, I'm asking this Court to find that an expectation of privacy in the air in the vehicle is just unreasonable under these circumstances. And the independent reason is the Cabales reason, because defendant has never asserted that anything other than the odor of contraband escaped the vehicle. So all the setup procedure did, as we explained, was force air from inside the vehicle to the outside vehicle, outside of the vehicle. And the canine sniff of that air, all it can disclose is the presence or absence of contraband, which the defendant has no right to possess. So it's not exactly Cabales, but it's an extension of the Cabales reasoning, because the only thing that can be disclosed by the canine sniff is contraband. There's also not a search. You mentioned Cabales. Let me step into another kind of approach to this. Is there any significance to the fact that Officer Tyler did not approach defendant for the violation of parking on the sidewalk while in front of the home, but waited for her to drive to a gas station, then stopped her for that violation after radioing for a canine unit to stop at the scene? In Cabales, the Supreme Court held that in considering the validity of a stop in a canine sniff, the manner and scope are irrelevant. The only relevant consideration is duration. The officer here saw the car on the sidewalk, 645, did not cite for any violation until 830. I'm wondering if this delay is within the meaning of case law that affects duration under Cabales. This officer knew what he was going to do. Is there anything in the record to show when he called for a canine unit? Did he wait until after the stop? Did he sit this up while he was parked in front of the home? When does the time start running in determining duration under Cabales for the facts of this case? It's the duration of the traffic stop itself. So here it's from the time that Officer Tyler stopped the car. Officer Kidd arrived with the canine approximately three minutes after the stop and about 20 seconds. He had not the running of duration under Cabales. He was in complete control of an officer who has a defendant who he suspects of something under his control, in effect, for an hour or so before he has actually stopped. Your Honor, defendant wasn't seized until there was a lawful traffic stop. There's no question here that there was a lawful traffic stop. And defendant doesn't contend that the stop was unreasonably prolonged by the canine. As I was going to say, Officer Kent arrived with the canine approximately 20 seconds after Officer Tyler went back to his vehicle. How long before then was he alerted to be there? And was he delayed making the arrest again, the kind of thing that could be considered under Cabales' duration analysis? No, Your Honor. Your Honor, then the officer's subjective intent for making the stop is simply irrelevant under the Fourth Amendment. As long as he witnessed a traffic violation, his subjective intent is irrelevant. Even though the officer was there, he knew the truck was parked in a crosswalk for over an hour, and he had additional knowledge from an informant that this particular person, before she moved the car, he knew that she, or suspected that she was a meth user, and for that reason had kept defendant's residence under surveillance. So actually, the defendant's residence was under surveillance for quite some time, which I don't know if we know on the record, but clearly this officer wasn't just doing it as a matter of course, he was doing it for a purpose. Yes, that's correct, Your Honor. Can I consider that under Cabales? That absolutely falls under Wren, and it makes no difference. Wren deals with the officer's subjective intent in making the stop. As long as he witnesses a traffic violation, that seizure is lawful. But the traffic violation he witnessed for an hour before, he waited until, according to, I don't know exactly what the record says, but he waited, he knew that the truck was parked in the crosswalk for an hour before it moved. So the violation was parking in the crosswalk. And so he watched it for an hour. So should we consider the hour before? No, we don't, because really it's the duration of the seizure of the defendant. See, the defendant wasn't seized at that point. She was in the house, in the apartment, I'm sorry. So either because the defendant had... Once she had exited the home, she was in his sight, virtually within his control, and that occurred at about what time? You know, does the record show? Pardon me? Does the record show what time she exited the home? Yes, she left about 8.15 at night. The officer started surveilling the house at about 6.45. It was about an hour and a half. She left about 8.15 at night and got into her truck. As I was saying, either because the defendant had no legitimate expectation of privacy in the air in the vehicle, as Justice Thomas was suggesting, or under the reasoning of Kabbalists, which is because a canine sniff of that air can disclose only contraband, which the defendant has no right to possess. There just simply wasn't a search here. But alternatively, we would argue that if there was a search, it was a reasonable one. And here we apply the familiar balancing test where you balance the degree to which this search infringes on the defendant's privacy interest versus the degree to which the conduct is necessary to provoke legitimate governmental interest. Now, as I discussed, the defendant's interest in keeping the air in her vehicle was minimal at best. This air is escaping all the time. Even when the door is closed, but during a traffic stop in particular, it's going out through the window. When you make contact with the officer, it can go out the door when the officer orders the driver or the passenger out of the vehicle. It's far outweighed by the state's legitimate interest here in detecting and preventing drug crime. And here the state, as Justice Garmon indicated, or as I'm sorry, as Justice Burke indicated, the state had information, Officer Tyler had information that defendant was using methamphetamine. He had information from a drug task force and he had information from a confidential source. And record reveals also, we don't know exactly when, but during the course of the stop, defendant also told Officer Tyler that she was going to her sister's house to burn her garbage, which Officer Tyler testified is common among people who cook meth. So the state has a legitimate and weighty interest in preventing this kind of drug crime, particularly with methamphetamine, which is a real concern in rural areas of the state. And also weighing in favor of the state is the fact that the setup procedure is really minimally intrusive, but it keeps the dog out of the vehicle. And you may recall that Justice Ginsburg's dissent in Kabbalah's talked about drug detection animals being intimidating animals. So it also has the added benefit, the setup procedure, of keeping the dog out of the vehicle. So even then, if the setup procedure was a search, it was a reasonable one under the Fourth Amendment. Was there any basis for allowing the dog in the vehicle in this case? What was the probable cause? No, Your Honor. There was only probable cause following the canine's alert. If there are no further questions, we'd ask that you affirm the judgment of the appellate court. Ms. Lange. I'd like first to address the matter that several of the justices have brought up about whether the windows are closed or open and what right do the police have to ask a defendant about opening and closing windows, stepping out of the car. I think that there's a, we don't know when an officer orders someone out of the car, we do not assume that the officer also swings open the door of the car, blocks the door of the car to keep air flowing out. The officer who instructs a defendant out of the car does not manipulate the car in any way. The officer acting out of safety concerns asks someone to step out of the car. The officer is not violating the defendant's or the stopped motorist's reasonable expectation of privacy. That's not true in this case. In this case, there was a testing that went on at the behest of the police. There was exploratory manipulation. There was probing of the inside of the car. The fact that the policeman did not stick his foot into the car is a fiction. It's a legal fiction. There was a constructive entry in this case. Something you said earlier, Ms. Lange, brings to mind another question when you're talking about opening and closing the windows. We've talked about, in this instance, about closing the windows. Is it as much a problem if the officer says open the window? If he goes to make the stop and the offender keeps the window up, can the officer say roll down your window? Well, I think the officer has to get identification information. Well, but you could, I suppose, hand it out the door or something. You could hand it out the door. But if it's okay to do that, then is it a problem if the officer says roll down all the windows in the car? Yes, I think that there's a distinction. First of all, I don't think that an officer getting information from a defendant, I think there's a distinction between saying roll down your window so you can hear me and roll down your window all the way, for instance. I mean, you assume that a person has to submit to the seizure in some way, but actually requiring action of a stopped motorist, which sends out a lot of, if we're to believe what the state says, incriminating information, that's a different story than just saying please hand me your identification. I mean, there are ways of handing identification. There are ways of not handing identification. If the motorist, for instance, opens the door, well, then that motorist has abandoned the sense of the legitimate, her legitimacy in her privacy concern. If she just rolls down her window a little bit, you know, she's really not, you know, acting with total abandon. And you made a very, I want to stop you. You said that if the motorist opens the door, she is abandoning her privacy concern. To a very, you know, a de minimis. Okay, and my question would be then, and it's a little bit redundant, but based on that statement, if a passenger opens the door, she abandons her privacy concern. My question is if there is an absolute right in a traffic stop for the officer to order, ask, order the motorist to open the door and leave the vehicle, was there ever a legitimacy, privacy concern in the air in that vehicle in the first place? I think there was. And I think that it's wrapped up in what the procedure is. There's no case law that even says when the motorist or the passenger is asked by the officer what she can do to get out of the car, what she must do on a legitimate traffic stop, that he even has to close the doors, is there? There's nothing that says that, but there's no, but... So in this case, since we deal with hypotheticals, in this case, the motorist is asked, if the motorist was asked out of the car and the dog is right there and the officer doesn't close the door or tell her to close the door, is that a search and seizure at that point of that error? If the motorist is ordered to leave the car, leave the doors open, it's one thing. If the motorist is required by the police to do something more probing than opening a car door, that's another thing. But if it's more than opening a car door and closing a car door, I think that privacy concerns are implicated. And especially this setup procedure, which I think is a tremendous intrusion on individual rights and could be seriously... You would agree, though, if there's no expectation of privacy in the air in the vehicle, it doesn't matter what procedure generates air out of that vehicle, whether it's opening the door, blowing the blowers, there has to be an expectation of privacy in that air. In the air and everything else within the vehicle. I don't think it's a simple matter of... In this case, we're dealing with air. I'm not quite so sure, but I think it's the privacy of the individual in that space. It's the entire space of the interior of a car. Just like we can't say that a person has no privacy right in the interior, in the air in their home. Because everything is interrelated. It's not just, well, you have no right in the air in your home, but you have a right to certain other things. I mean, air is part of your home. Air is part of your car. It's the environment of the interior of the car. It's not just little bits of it. You can't say that you have a privacy right in your floorboards, but not the other. Because the testing procedure that we don't even know is legitimate, was an intrusive behavior on the part of the Adams County Police. Ms. Bartelt would ask that you reverse the decision of the appellate court, thereby reaffirming the judgment of the trial court. Just one last question. What was the contraband found? There was a pipe casing, I'm sorry, a pen case that had an end burned, and apparently there was some methamphetamine within this pen. And then there were some, I mean, it was really, we don't have a weight, but there were a couple of strips of silver foil that had some kind of substance. And that was determined to be paraphernalia? Well, we never got that far because there was no trial. There are no other questions. Thank you.